## Case No. 5,716.

### GRAY et al. v. HARPER et al.

[1 Story, 574;[1] 4 Law Rep. 334.]

Circuit Court, D. Massachusetts. Oct. Term, 1841.

CONTRACT OF SALE—CONSTRUCTION OF—EVIDENCE.

1. Construction of a contract in relation to the sale of books.

[Cited in Bell v. Golding, 27 Ind. 180.]

2. Conversations between parties, at the time of making a contract, are competent evidence to show the sense, which they attached to a particular term used in the contract.

[Cited in Quarry Co. v. Clements, 38 Ohio St. 592; Donley v. Tindall, 32 Tex. 43; Collender v. Dinsmore, 55 N. Y. 210.]

This was an action of assumpsit to recover the sum of $841.39, the balance of an account, alleged to be owing by the defendants [John Harper and Brothers] to the plaintiffs [Hilliard, Gray & Co.], for sundry volumes of Sparks's American Biography. The plaintiffs, in order to maintain their action, produced in evidence the following agreement: "Boston, May 22, 1839. We agree to take of Hilliard, Gray & Co. any volumes of Sparks's American Biography, bound or unbound, that they may ship to us, within three months from this date, at the cost thereof, and pay for the same in six months from date of shipment. Harper & Brothers." The plaintiffs contended, that the cost of the books in question consisted of four items of expense: 1st, paper; 2d, press-work; 3d, binding; 4th, amount paid by the volume to the owner of the stereotype plates to produce the books. To prove these items, they introduced in evidence a letter written by the plaintiffs to the defendants, as follows:

"Boston, August 10th, 1839. Gentlemen:— On the 22d of May you agreed to take of us any volumes of Sparks's American Biography, bound or unbound, that we might ship to you within three months from that date, at the cost thereof; we have accordingly shipped this day, as per bill of lading. to your risk, the books, as per bill. and on the same sheet have given a statement of the cost of making the books, with the amount paid Mr. Sparks for copyright; but we have added nothing for interest, which we shall claim the right to add hereafter, if you dispute the correctness of our estimate, or way of making up the cost, according to a legal construction of your contract, that would make the cost to us as much as the paper. We have put in, also, a large lot of back-titles and over-sheets, for which we have made no charge; but we shall expect them to be returned to us, unless you will agree, that if any of the books we have heretofore sold

should be found incomplete, that you will supply the sheets wanted without charge to us. We have charged a lot of heads, title-pages, and fac simile plates, at less than cost to us, they being valuable to you; but if not willing to pay the sum named, please return them to us. If we had time, many of them might have been placed in the volumes sent. consequently not so much deducted from the volumes, where they belong. But this is a small matter,—you may take them, or not, at that price, as you choose. Having complied with our part of the contract with you, we shall expect you to send us your note at six months from this date, for $1641.39—less $25 for the plates, if you do not take them. Yours, respectfully, Hilliard, Gray & Co. Messrs. Harper & Brothers, Booksellers, New York. P. S. You will find all the copper and steel plates, belonging to the work, in a bundle, in box No. 6."

On the same sheet with this letter, was a computation of the cost of the American Biography, made up by the plaintiffs, each volume separately. and specifying the number of volumes printed:

| No. of copies. | | Cost of paper. | Cost of printing. |
|---|---|---|---|
| Vol. | 1, 2000 | $255.50 | $245.33 |
| | 500 | 53.40 | 24.00 |
| " | 2, 2000 | 256.38 | 283.70 |
| | 500 | 60.40 | 23.40 |
| " | 3, 3000 | 328.50 | 279.70 |
| | 500 | 50.40 | 24.30 |
| " | 4, 2000 | 259.30 | 281.67 |
| | 1000 | 128.45 | 140.83 |
| | 500 | 60.20 | 24.30 |
| " | 5, 2500 | 295.43 | 118.45 |
| " | 6, 1500 | 174.15 | 73.00 |
| | 500 | 53.40 | 21.60 |
| " | 7, 1500 | 218.25 | 81.00 |
| " | 8, 1500 | 195.75 | 78.00 |
| " | 9, 1500 | 152.25 | 76.00 |
| " | 10, 750 | 84.20 | 40.00 |
| | 750 | 84.20 | 40.00 |
| | 22,050 | $2709.97 | $1855.48 |

| | | |
|---|---|---|
| Paper, | | 2709.97 |
| Binding, | | 2812.00 |
| Printing fac similes, | | 304.50 |
| " portraits, | | 196.87 |
| Paper for fac similes, | | 52.20 |
| " " portraits, | | 29.25 |
| | | $7960.27 |

being 35,37-100 cents per volume.

| | | |
|---|---|---|
| Vols. 1, 2, 3, and 4,—cost of paper, &c., | $.3537 | |
| Copyright paid Mr. Sparks on these volumes, | .1250——$.4787 | |
| 883 vols.. | | $421.59 |
| Vols. 5, 6, 7. 8, 9, and 10, —cost of paper. &c.., | $.3537 | |
| Copyright paid Mr. Sparks on do., | .2600 | |
| 2623 vols. | $.6137 | 1609.73 |
| 3506 vols. | | $2031.32 |

being 57 cents per volume.

The account of the volumes sent was also contained in the same sheet, by which it appeared, that they had sent 3506 volumes,

bound, unbound, and in sheets: some with and some without plates; among these there was not a perfect set, and 1600 volumes were imperfect. The amount charged for the books was $1611.97; lot of portraits, title-pages, and fac similes, $25; 4 boxes. $4.42—$1641.39. The plaintiffs then produced the following letters:

Harper to Gray: "New York, August 30th, 1839. Messrs. Hilliard, Gray, & Co. Gentlemen:—Your favor of the 10th instant has been received. Having several times, in person, demurred to your charges for copyright on the odd volumes of Sparks's American Biography, we now do so formally, in writing, and at the same time propose leaving the question at issue between us to the arbitration of disinterested men. We requested Messrs. Folsom, Wells, and Thurston, some time since, to forward the volumes of the work, which they printed for us; but, as they have not done so, we take the liberty of asking you to request them to send them on without delay. Respectfully your obedient servants. Harper & Brothers."

Gray to Harper: "Boston, December 9th, 1839. Gentlemen:—In our last we requested you to send us your two acceptances of $800 each, to balance the bill of Biography; but not hearing from you, and wanting that paper for immediate use, we have drawn on you for $800, through the bank, which we trust you will not refuse to accept, on account of our bill for Biography, as it is only part of the amount, and will not compromise you in the question in dispute between us. We have made the draft payable in March, instead of February, when the amount is due; and we hope you will not hesitate to accept it and send us another for the balance soon, and thus end this disagreeable affair without any more words on the subject. Yours respectfully, Hilliard, Gray, & Co. Messrs. Harper & Brothers, New York."

The plaintiffs upon these letters contended, that the only question left open was the question of copyright. They abandoned the claim for amount of copyright paid on the first four volumes. They then produced an agreement made between the plaintiffs and Mr. Sparks, for publishing the last six volumes, by which it appeared, that the plaintiffs agreed to pay Mr. Sparks $650 per volume for the right of publishing 2500 of each of the said volumes, and the use of the stereotype plates. This agreement bore date April 26th, 1836. They also produced the receipts of Mr. Sparks for $650 for each of said volumes. The receipt for the last volume was dated November 15th, 1838. They then called Charles Folsom, who proved the price of printing to be as stated in the account rendered by the plaintiffs. He also made the following statement of the number of volumes published, the time of publication, and cost and time of stereotyping each:

| | | | |
|---|---|---|---|
| Vol. 1 | 2000 copies from movable types—1834, Jan. 27, | .. | $238 01 |
| | 500 | stereotype plates—1838, Dec. 20— | |
| Vol. 2 | 2000 | movable types—1834, April 11, | 270 83 |
| | 500 | cost of plates, stereotype plates—1839, Jan. 27— | |
| Vol. 3 | 2000 | movable types—1836, Jan. 8, | 230 78 |
| | 500 | cost of plates, stereotype plates—1839, Feb. 14— | |
| Vol. 4 | 2000 | movable types—1835, Aug. 12. | |
| | 500 | cost of plates, stereotype plates—1839, April 10— | |
| Vol. 5 | 2500 | stereotype plates—1836, May 28, | 270 89 |
| | | cost of plates, | |
| Vol. 6 | 1500 | stereotype plates—1836, Sept. 6, | 275 50 |
| | | cost of plates, | |
| Vol. 7 | 500 | stereotype plates—1839, April 26, | 264 04 |
| | 1600 | cost of plates, " " 1837, March 8, | |
| Vol. 8 | 1500 | stereotype plates—1836, Sept. 6, | 305 00 |
| | | cost of plates, | |
| Vol. 9 | 1600 | stereotype plates—1837, Sept. 25, | 281 16 |
| | | cost of plates, | |
| Vol. 10 | 750 | stereotype plates—1838, March 16, | 204 89 |
| | | cost of plates, | |
| Vol. .. | 750 | stereotype plates—1838, Dec. 20, | 302 41 |
| | | cost of plates, stereotype plates—1839, Feb. 8. | |

The defendants admitted, for the purpose of this trial, that the cost of paper and binding of said volumes was correctly charged in the plaintiffs' account. The plaintiffs here rested their case.

The defendants' counsel then opened the defence, and introduced the following evidence.

(1) A deed of the copyright of the whole ten volumes, and the stereotype plates of the last six volumes, from Jared Sparks to Hilliard, Gray, & Co., dated October 15th, 1838, and recorded November, 1838, for the consideration of $2400,—reserving to Mr. Sparks the right of publishing the lives written by himself.

(2) A deed of the copyright of stereotype plates of the whole ten volumes, from Harrison Gray and Charles Brown to Harper & Brothers, dated May 22d, 1839, acknowledged June 27th, 1839, and recorded July 15th, 1839, —reserving to Mr. Sparks the same rights as the deed to Hilliard, Gray, & Co., and subject to a contract made with Messrs. Folsom, Wells, & Thurston, and a contract made with Marsh, Capen, & Lyon, by Hilliard, Gray, & Co.

(3) A deed from the plaintiffs to the defendants, (which had been cancelled on account of informality of execution,) dated May 22d, 1839, of the same copyrights and plates as preceding, and in every respect like it, except that it was made and executed in the firm name of Hilliard, Gray, & Co., and contained no reference to the contracts with Folson, Wells, & Thurston, and Marsh, Capen, & Lyon.

(4) The following correspondence between the parties:

Harper to Gray: "New York, June 29th, 1839. Harrison Gray, Esq. Dear Sir:—The

deed of copyright for 'Sparks's American Biography,' which you have substituted for the one, which I obtained from you, when I made the purchase, is not satisfactory. At the time I received it of you, you promised, in the presence of Mr. Wells, that you would have another executed, with the individual signatures of your firm, if required. My brother understood, that you declined giving such a deed; but I am in hopes, that he misunderstood you. Permit me, therefore, to inquire, whether you will, or will not, have such an instrument executed, without any variation, other than that of substituting the individual signatures of your house, instead of the general signature of your firm? Please let me hear your definite and conclusive decision by return of mail, and much oblige your ob't servant, F. Harper."

Gray to Harper: "Boston, July 2d, 1839. Fletcher Harper, Esq. Dear Sir:—I duly received yours of the 29th, and must confess, that I am quite surprised at its contents. When your brother presented our deed, signed by me for our firm, no objection was made as to a new one; my partner, Mr. Brown, who had never seen the paper before, suggested, that, as we had conveyed to you two contracts with Marsh, Capen, & Lyon, and Folsom, Wells, & Thurston, they should have been added or recognized in the contract or conveyance; and it was agreed to by your brother, and made part of the new conveyance. Now, as this was an agreement with the senior partner of your house, and only recognizes the two contracts, which made part of the contract or conveyance to you, I cannot see, why you have any reason to be dissatisfied with it, and I would respectfully ask you to state, where it differs from our original agreement. Respectfully, &c. H. Gray."

Harper to Gray: "New York, July 9th, 1839. Harrison Gray, Esq. Dear Sir:—My brother Fletcher has just shown me a letter from you, in which you state, that I agreed to a change in the deed of copyright, which you gave him for Sparks's American Biography. In this you are mistaken, as I distinctly informed you, that I had paid no attention to the subject of the contract, and did not feel myself at liberty to interfere therein; and it was entirely upon your representations, that all should be right and satisfactory, that I consented to the destruction of the original deed. Having since heard my brother's views, objections, &c., I now concur with him in opinion, that the present deed is not satisfactory, and such as under the circumstances it should be; and that you are bound in honor to execute the deed, as originally agreed upon between him and yourself. Hoping that you will not refuse to do so, I remain yours truly, James Harper."

Harper to Gray: "New York, July 9th, 1839. Harrison Gray. Esq., Boston. Dear Sir:—I have yours of the 2d inst. By the annexed letter of my brother, you will at once perceive, that the ground you assumed, of there having been 'an agreement made with the senior partner of our house,' is not correct. Permit me, therefore, again to inquire, whether you will, or will not, fulfil the agreement you made in relation to the original deed of copyright, which you gave me. Please let me hear from you by return of mail. Your ob't servant, F. Harper."

Gray to Harper: "Boston, July 11th, 1839. Dear Sir:—Yours of the 9th, with your brother's of same date, is before me. I am more surprised at his letter than I was at your last, as I can prove all, I stated in my last, that your brother cheerfully agreed to the change we made in the conveyance of the copyright, and read the same over carefully with our bookkeeper, after he had copied the original memorandum agreed upon; and I cannot see, why you, or he, or any one else, should be dissatisfied with it, as I can prove by Mr. J. Brown, that you agreed to fulfil those contracts; and if you will refer to the transfer of them on the back, you will find, that in Folsom, Wells, and Thurston's it was so expressed; and you must be aware, that we could not legally give you a deed of the copyright without reference to those contracts. And as I am unwilling to suspect, that you wish to have the deed with that omission, to make a question of your liability to fulfil those contracts, you will please inform us, as I requested in my last, what you are dissatisfied with, or send us the form of a deed, such as you want, and if not inconsistent with my agreement with you, and has reference to the fulfilment of those contracts, I have no doubt my partner will cheerfully sign it with me. Yours respectfully, Harrison Gray. Fletcher Harper, Esq., New York."

Gray to Harper: "Boston, July 20th, 1839. Gentlemen:—When your Mr. James Harper was here, we gave him a letter to your house, with a list of the volumes of American Biography on hand, and proposed an exchange of vol. 5 for vols. 1, 2, and 3, to complete sets. If this is done, we must have the vols. 1, 2, and 3 immediately, or we shall not be able to complete the sets in season to answer our purpose, and the consequence will be, that we shall have a larger lot of odd volumes to send you, at a high price, according to the contract with us. Let us have your order, by return of mail, on Messrs. Folsom, Wells, & Thurston, for the volumes, according to our letter, and much oblige your ob't servants, Hilliard, Gray, & Co. Messrs. Harper & Brothers, New York."

Harper to Gray: "New York, July 23, 1839. Messrs. Hilliard, Gray, & Co. Gents:—Yours of the 20th instant is at hand. We are unwilling to comply with your request therein. You need not fear but that any 'contract' you have with us, whether at a 'high price' or low price, will be fulfilled to the letter. Respectfully, Harper & Brothers."

(5) A copy of the agreement made for the purchase of the volumes of the Biography in the handwriting of the plaintiffs' clerk, in all respects like the one produced by the plaintiffs, except at the foot of the same was a memorandum of three acceptances of $2000 each.

(6) Three acceptances of the defendants, which they had taken up, for $2000 each, dated May 22d, 1839, payable to the plaintiffs in six, nine, and twelve months. Also three acceptances (taken up) for $800, dated December 9th, 1839, in three months.

(7) The assignment from the plaintiffs to the defendants of the contract with Marsh, Capen, & Lyon, dated May 22d, 1839, and the contract with Folsom, Wells, & Thurston, of the same date.

Here the defendants rested their case.

The plaintiffs then called Jared Sparks, who testified to the payments being made, as stated in his receipts. John G. Roberts, who testified, that many of the volumes sent were deficient only in engravings, title-pages, and portraits. James Brown, who testified, that he was a secret partner of the firm of Hilliard, Gray, & Co. at the time of the transfer of the copyrights and plates to the defendants; that he recollected the transaction; that he was present at Gray's store when the negotiation was going on between Gray and Fletcher Harper; that he understood, that the defendants had agreed for the copyright, plates, and all the odd volumes. He could not say, that the written contracts had then been signed. He did not recollect, that anything was said as to the cost of the odd volumes; something was said about completing of sets; the defendants were to fulfil the contract with Marsh, Capen. & Lyon, and Folsom, Wells, & Thurston. Witness could not state, what was said in regard to Gray's retaining the plates for that purpose. They had some difficulty, but he could not state what. as his attention was not specially called to it at the time. Soon after, Gray and F. Harper came to the store of the witness; they differed as to the details of the bargain, and came there to settle in some way or other. The difficulty was, what constituted the cost of a volume. Gray wished to include copyright. Harper thought it ought not to be included, as he had already purchased the copyright. Harper offered to refer the question to me to decide; this, Mr. Gray declined. Witness did not hear Gray tell Harper, what the cost would amount to. He said the cost would be high. At the time of the last conversation, witness supposed the contracts had not been signed, as it was so soon after the first conversation. He did not, however, know, whether they had or had not then executed the contracts.

The defendants then introduced the following note from the plaintiff:

"Tremont House, 8 o'clock p. m., May 24th, 1839. I called to see you, in hopes we should be able to settle the price of the volumes of Biography. If it is not correct to include the plates in the cost, something should be added for their use. At any rate, I think if you will stop until the afternoon train for Worcester, to-morrow, you and I can settle the question without the sin of giving any wine to referees for what we can settle ourselves. I cannot ship the books, until this question is settled. We shall lose the chance of selling them to others. Yours truly, H. Gray."

Rand & Fisk, for defendants, contended: (1) That the plaintiffs' account, as made up by them, was erroneous upon their own principle. That all the volumes sent were printed from plates, and that in computing the cost, the plaintiffs had charged for what is technically termed composition on the first four volumes. That the amount to be recovered by the plaintiffs, if the charge of copyright on the last six volumes was correct, was $633.23. If the copyright was not included correctly, then the defendants had overpaid $49.75. That from the above sum, at all events, should be deducted the amount, charged for the copies of the sixth and tenth volumes sent, which had been printed since the plaintiffs became proprietors of the copyright and plates. (2) That the charge for copyright, or use of plates, was not to be reckoned as part of the cost of the books under the circumstances of this case. That whatever might be the true meaning of the terms "cost thereof," under ordinary circumstances, under the circumstances of this case they could only include the "cost of making" the books. That the plaintiffs owned the copyright, and therefore stood precisely in the same position as the author, and he might as well include, what he had expended in writing the book, as the defendants could, in this case, include, what they had charged; and the plaintiffs might with equal propriety here include the cost of the stereotype and altered plates. That the sale of copyright and plates having been made to the plaintiffs at the same time, or just prior to the making the contract for the books, it was most manifest, that the defendants never could have intended to pay the plaintiffs a second time for the copyright; that they could only have intended to mean, by the word costs, the cost of "making the book," and that the plaintiffs could not have intended any more, nor could they in justice recover any more. That the defendants having purchased the copyright and plates of the plaintiffs, were in fact doing the plaintiffs a great favor to take, at the cost of manufacturing, the odd and imperfect volumes, which they might have on hand after three months further sales. That the defendants' view of this matter was aided by the consideration, that, as they owned the copyright and plates, they could produce the books for the simple cost of making them; and it could hardly be supposed possible, that they should be willing to pay for odd and imperfect volumes to the

plaintiffs twenty-six cents per volume more than what it would cost to produce them.

John A. Bolles, for plaintiffs, contended, that the contract of the defendants for the purchase of the volumes of Biography, and the sale of the copyright and plates by the plaintiffs, were separate and independent contracts, as much so as though they had been made with different persons. That from the evidence it was certain, that the plaintiffs had paid Mr. Sparks twenty-six cents per copy for each of the last six volumes. and that, therefore, the same was part of the cost to them, and to be included in the sum to be paid by the defendants. That it was certain, from the contract with Mr. Sparks, and the number of volumes published, that the plaintiffs had paid Mr. Sparks thirty-seven cents per volume, and therefore were entitled to recover $959.41. That if they were precluded by the account rendered by them from recovering beyond twenty-six cents per volume, they were entitled to recover $674.18, the whole number of copies of the last six volumes sent by the plaintiffs to the defendants, being 2593. That the defendants, in their letter of August 30th, 1839, having excepted only to the charge for copyright, were presumed to be satisfied with the order of cost as made up by the plaintiffs, and the sum paid by them was intended to apply to those items only. The plaintiffs farther contended, that from the last letter of the plaintiffs, introduced in evidence by the defendants, it was to be presumed, that the whole question had been settled between the parties, and that the assent of the defendants to the charge for copyright was to be presumed therefrom.

STORY, Circuit Justice (charging jury). It appears to me. that the words of the written contract. "at the cost thereof," ought to be construed, "all the cost of the copies," including the allowance to Mr. Sparks. unless it is clearly made out in the evidence, that the parties, in the use of this language. adopted a different construction, and limited the "cost" to the mere expense of the paper, press-work, and binding. I do not think, that it is absolutely incompetent for the parties to show, from the conversations between them at the time of the making the contract, what was the sense, in which they then understood the word "cost" as used in the contract. as it is a word capable of a larger or narrower construction according to the subject matter, and the circumstances of the particular case. Those conversations may be deemed a part of the res gestae. and thus may be referred to, as explanatory of the real intentions of the parties in the use of the word. It appears. however, that the parties at the very time differed as to the very point, whether the money paid to Mr. Sparks ought to be included in the "cost" or not; and there is no evidence to establish in direct terms, how the disputed item was settled between them. If the contract was signed after the dispute, it would go far to show, that the word "cost" ought to include the money paid to Mr. Sparks, since in its general meaning the word "cost" would certainly comprehend that expense. But the learned counsel for the plaintiffs insist, that the contract at the time of the dispute had been actually signed and completed; and if so, then every inference of this sort is repelled. On the other hand, if the contract was not signed at the time of the dispute, it is singular, that the ambiguity should not have been removed by the addition of some explanatory language.

The whole point in the argument turns upon this. The plaintiffs say, that "cost" includes all the items of cost, there being no qualifying words to limit the meaning. The defendants, on the other hand, say, that this could not have been the intention of the parties, because the defendants had then purchased all the stereotype plates from the plaintiffs, and consequently could publish complete copies of all the volumes, instead of taking broken series, at the mere cost of the paper, press-work, and binding; and this is certainly true. If the purchase of these volumes had constituted a part of the original bargain for the purchase of the copyright and plates for $6000, then it would be easy to see, that the taking of these copies at the enhanced price of the money paid to Mr. Sparks might have been included. But this construction also is repudiated by the plaintiffs' counsel, who insists, that the bargains were independent of each other. There is, therefore, great difficulty in arriving at a satisfactory conclusion; and the jury will decide the matter upon a close review of all the circumstances.

The jury retired at half past one o'clock in the afternoon. and after remaining together until the opening of the court on the next morning. came in and stated, that they could not agree. The judge, upon their application, gave them some farther instructions, and they again retired. At half past ten o'clock they again came into court, and said, that there was no prospect of their coming to any agreement, and they were then discharged.